

Ronald K. Henry
+1 202 682 3590 office
ronald.henry@kayescholer.com

The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005-2327
+1 202 682 3500 main
+1 202 682 3580 fax

November 6, 2013

Kimberly M. Zeich
Tina Ballard
U.S. AbilityOne Commission
1401 South Clark Street
Suite 10800
Arlington, VA  22202

Re:   **NTI Protest of USDA Helpdesk Opportunity 21573**

Dear Ms. Zeich & Ms. Ballard:

We are the attorneys for National Telecommuting Institute, Inc. ("NTI"). We write in response to Ms. Zeich's letter to Dr. M.J. Willard, Executive Director of NTI, dated October 30, 2013, regarding NTI's request for a meeting with Ms. Ballard, the U.S. AbilityOne Commission's (the "Commission") Executive Director, in connection with NTI's appeal of SourceAmerica's award decision regarding the U.S. Department of Agriculture's ("USDA") Helpdesk Opportunity 21573.

In the October 30, 2013 letter, you stated that the Commission would only consider appeals regarding a Central Nonprofit Agency ("CNA") selection decision if the proposed appeal met one of the three stated criteria under section 6(d) of the Commission's Policy 51.301. As described below, because NTI's appeal of SourceAmerica's decision meets all three criteria, the Commission should grant NTI's request for an appeal and a hearing before Ms. Ballard.

**I.    SourceAmerica Failed to Follow its Established Policies
       of Informing All Competitors of Key Evaluatory Criteria**

NTI submitted a proposal in response to the USDA Helpdesk Opportunity 21573 with the understanding that a certain amount of subcontracting to a large business, which would provide critical technical skills, was not only allowed but encouraged. NTI relied on its reading of the B-1 Distribution Process 2.h as well as its extensive experience with the program. NTI has served as an AbilityOne prime on an IRS call center contract for the past nine (9) years, paying 27% of

the contract revenue to a large business which serves as the technical subcontractor. NTI has been extremely successful with that model, including winning 6 SourceAmerica awards, the most recent of which was an Award for Excellence in May 2013. After interviewing four potential technical subcontractors for this USDA contract, NTI selected IBM, the incumbent on the current USDA/Forest Service contract. In NTI's presentation to USDA evaluators and SourceAmerica representatives, and in the written material NTI submitted in connection with its proposal, NTI proposed the same type of relationship with IBM as has been in effect for the past 9 years on NTI's IRS call center contract.

Given this extensive working relationship, NTI was surprised to be told during its de-briefing by SourceAmerica representatives that "your partnership (with IBM) would not make it past the Commission based on suitability." Further, Joe Diaz, SourceAmerica's Executive Director, East Region, spoke of "heightened sensitivities" on the part of the Commission, and told NTI that there was a "sea change within the program that is based on litigation and overturns in the federal Court of Appeals." NTI was further told that "the Commission does not care about the technical solution, they care if it's been demonstrated that the nonprofit is firmly in control of the project and it's not a fraud, a sweetheart deal."

Following the de-briefing Dr. Willard called the Commission and spoke with Nancy Myrick. Dr. Willard learned that the Commission planned to revise its guidelines on Community Rehabilitation Programs ("CRPs") such as NTI using large businesses as subcontractors, but that any changes were expected to be minor. When asked if the Commission could share these new guidelines with NTI, Ms. Myrick explained that they had not been written yet.

NTI was at a significant disadvantage in addressing concerns the SourceAmerica evaluation team had with respect to NTI's subcontracting relationship with IBM because NTI was unaware of any heightened sensitivities, Commission memos, or new Commission guidelines pertaining to partnerships with large businesses. Indeed, SourceAmerica improperly relied on its understanding of a pending Commission "sea change" as part of its evaluatory criteria. If SourceAmerica planned to rely on such unstated criteria, it was incumbent on them to notify all competitors of this new criteria.

In response to NTI's original July 11, 2013 protest, Martin Williams of SourceAmerica denied the existence of any new Commission guidelines (which NTI had already discovered) but failed to explain why SourceAmerica's evaluation team relied on their understanding of a pending change to the guidelines in their evaluation of NTI's relationship with IBM.

Following NTI's request for a second-level review on July 30, 2013, Dennis Fields, SourceAmerica's COO, responded by letter dated September 12, 2013 (which was actually emailed to NTI on October 4, 2013), asserting that Mr. Diaz had not been referring to the

Kimberly M. Zeich          November 6, 2013 | Page 3

Commission's as yet unwritten new guidelines, but instead was referring to "the revamping of the AbilityOne Program Bulletin No. B-1" guidelines. While Mr. Diaz did refer to the new B-1 guidelines for which training would be available this fall, that was not the issue NTI raised. Instead, Mr. Diaz's statement that "your partnership would not make it past *the Commission*" is the core issue. Indeed, Dr. Willard only called the Commission to request a copy of any new policy when it became obvious that the Commission's "heightened sensitivities" in subcontracting with large businesses was a key reason why NTI failed to win the selection competition.

Mr. Fields' letter further asserted:

> "The management structure proposed (by NTI) ceded all operational responsibility to IBM. NTI's management role was primarily for government interface and Human Resources support for desk support agents with minimal accounting and contract management. As the response provided details that it would be IBM providing the day to day program management of the contract and not NTI, it was apparent that NTI would not be assuming the traditional prime contractor responsibilities."

These statements are false. There was nothing in NTI's written material or its 90 minute presentation to the USDA and SourceAmerica (which was recorded by the USDA) that would support such a description of the NTI/IBM relationship. Because these false assertions are so critical to NTI's position and need to be corrected, included below is a chart that summarizes the actual proposed NTI/IBM relationship which was taken from the written material that NTI presented to the evaluation team prior to the selection decision. As stated in several parts of the presentation, this chart depicts almost the same relationship NTI has with the current subcontractor on its award winning IRS call center contract. The chart makes clear that NTI proposed (i) to manage the contract fiscally and programmatically, (ii) recruit, hire, train and supervise the agents with disabilities, and (iii) rely on IBM for technical tasks that its employees were uniquely qualified to perform. As NTI stated, during the initial stages, 82% of the individuals on this project would have been NTI employees, and eventually 100% of the technical support agents would have transitioned to NTI, leaving IBM with 4-5 technical employees, including a knowledge manager, system administrator, technical operations manager and technical project manager. Unfortunately, SourceAmerica was less concerned with the reality of what NTI proposed than with its perception that the Commission would view this relationship as a "sweetheart deal."

Kimberly M. Zeich          November 6, 2013 | Page 4

1.     **Describe by chart, narrative or other method specifically which functions will be performed by any subcontractor vs. what your organization intends to perform directly.**
a.

| Role | Function | Prime – NTI | Subcontractor-IBM |
|------|----------|-------------|-------------------|
| Program Manager | Government interface/program leadership | X | |
| Human Resources | Hire, Onboarding, Termination, Coaching | X | |
| E_Learning | Training: Content creation and delivery | X | |
| Account Services | Day to day Program Management | X | |
| Recruiting | Candidate outreach, skill set matching | X | |
| Finance | Provide financial and administrative management of NTI's Federal contract including: monitoring, maintenance, and reporting. | X | |
| Project Manager | Project tracking, site management | | X |
| Operations Managers | Agent Supervision | X | X |
| Knowledge Management | Define, build and maintain knowledge management database | | X |
| System Administrator/ Development Lead | Manage, maintain and monitor all components of the call center technology. | | X |
| Help Desk Agent-Virtual | T1 IT Helpdesk agent (Headcount ~70) | X | |
| Help Desk Agent – Advanced Security | T1 IT Helpdesk agents requiring higher security levels (Headcount ~15) | X | X |
| IIA Helpdesk Agent | IIA IT Helpdesk agents (Headcount ~15) | X | X |

## II.     SourceAmerica Did Not Properly Document Its Decision

Despite months of research and review by Mr. Williams and Mr. Fields, the materials and information NTI requested have not been produced.  NTI has repeatedly requested copies of the USDA evaluation forms from the competition and have been denied access to them.  Even after Jean Robinson, an attorney for SourceAmerica, acknowledged in a conversation with NTI representatives that NTI would legally be allowed to view those forms, they still have not been produced.

Even more disturbing is the failure of Mr. Fields to provide any information in response to the multiple requests NTI made concerning Peckham's hiring practices. Currently, 62% of AbilityOne's target population is receiving Social Security disability benefits. Despite having approximately 3,000 employees, Peckham reported to the Social Security Administration ("SSA") that they had only 3 beneficiary tickets under the SSA Ticket-to-Work program assigned to Peckham in 2010, and only 4 tickets assigned in 2011. It would be highly unusual for an organization to participate in the Ticket-to-Work program, hire beneficiaries and not report such hires to the SSA. However, to be certain there was no mistake or misunderstanding, NTI asked Mr. Fields to verify with Peckham that only these few beneficiaries were actually hired. Despite 66 days of investigation, SourceAmerica either failed to pose that question to Peckham, or SourceAmerica has posed the question but failed to share any such answer with NTI.

While Mr. Fields did not answer this question, he spent almost half of his October 4 denial letter explaining why many CRPs choose not to participate in the Ticket program and many beneficiaries' are not aware of the Ticket program. While these may be accurate statements, they are irrelevant to the question asked. Given that Peckham did choose to participate in the program and made clear on their job applications that they track this information, the question remains why Peckham would only report such a small number of tickets if they had more than this miniscule number of hires with severe disabilities.

## III.   The Selected NPA Did Not Meet the Minimum Criteria

In a meeting between Dennis Fields and Dr. Willard on August 30, 2013, Mr. Fields explained that if Peckham was guilty of the allegations made (failing to hire people with severe disabilities) then they should not be part of the AbilityOne program. Mr. Fields stated he was referring this issue to the Commission for its consideration. In response, Dr. Willard explained that just as SourceAmerica evaluated competing CRPs on factors including their management teams, facilities and prior experience, SourceAmerica should be empowered to make a judgment between two CRPs based on their ability "to maximize the employment options for people with severe disabilities." As this is the purpose of the AbilityOne program, Dr. Willard simply asked that SourceAmerica evaluate both Peckham and NTI on that key factor. Mr. Fields was adamant that he was not going to make that judgment call and that the matter would be referred to the Commission.

The extent to which two competing CRPs are likely to place non-competitively employable people with severe disabilities into federal customer's jobs is central to a selection decision. Because Mr. Fields declined to make that decision this is a departure from

Kimberly M. Zeich          November 6, 2013 | Page 6

SourceAmerica's established procedures.   For this reason alone, Mr. Fields has provided sufficient grounds for an appeal to the Commission.

SourceAmerica's selection of Peckham, without an investigation of the evidence that Peckham has a poor track record in recruiting employees from the target population, is at the heart of NTI's protest.  If both Peckham and NTI are acceptable to the USDA, then the contract ought to go to the CRP that can maximize job matches for the target population.  That is particularly the case if there are major differences between the two CRPs with respect to recruiting practices and hiring results.

Joe Diaz's insistence on relying exclusively on the honor system (in which CRPs themselves decide if a job applicant is severely disable and non-competitively employable) is insufficient and ignores all evidence to the contrary that such a system is rife with exploitation. As noted above, with Peckham there is considerable evidence to suggest that they have failed to meet the central goal of employing people with severe disabilities.

NTI requests the Commission consider the evidence described below (and attached hereto), and then request the information from Peckham and NTI (described in Appendix A, attached hereto) that could be definitive in helping the Commission make its decision:

- A letter from Becky Ogle, former Executive Director of the Presidential Task Force on Employment of Adults with Disabilities, describing a visit she and Andy Houghton, former Chair of the Committee for Purchase from Blind and Severely Disabled, made to Peckham in 2010.  They were sufficiently disturbed by what they saw that Mr. Houghton requested a Commission audit.  No audit was performed. (Attached hereto as **Exhibit 1**).

- Evidence Dr. Willard submitted in a proposal to the Commission Stewardship Committee indicating that Peckham may have recruited less than 1% of its workforce from the population of 10 million Americans receiving SSA disability benefits.  Notably, 62% of the AbilityOne target population receives disability benefits.  Further, in contrast to Peckham, National Industry for the Blind contractors, who are only allowed to hire those who meet well defined measures of disability, have hired 66% of their workforce from the disability rolls.  NTI's hires 88% of its workforce from the disability rolls.  (Attached hereto as **Exhibit 2**).

- A news story that describes NCED, one of the largest AbilityOne contractors, as having nearly 4,000 employees who, like Peckham's workforce, included a large percentage of non-English speaking immigrants performing garment manufacturing work for the Defense

Kimberly M. Zeich            November 6, 2013  |  Page 7

industry.  Like Peckham's workforce, few of NCED's workers had any visible signs of disability.  Despite passing audit after audit, when finally subject to a full investigation, it turned out only 7.8% of NECD's workforce were judged severely disabled.  While the articles focus on the scandal at NCED and the failure of SourceAmerica audits to detect fraud, they also mention a half dozen other problems associated with the JWOD program, including Peckham's illegal outsourcing of labor hours that should have been performed by people with severe disabilities.  (Attached hereto as **Exhibit 3**).

NTI requests that you require NTI and Peckham to supply you with the information described in Appendix A as a condition of being considered to perform the USDA Helpdesk Opportunity 21573.  We believe that your review will demonstrate that the appropriate course is to award the USDA contract to NTI.  Review of this critical information will guide your decision concerning NTI's appeal and should also prove useful to your Stewardship Committee, which is considering a proposal to adopt this independent verification practice for all CRPs.  An independent measure of who is actually being hired for AbilityOne contracts is sorely needed.

We appreciate your consideration of this appeal and again request an opportunity to make a presentation to Ms. Ballard to more fully elaborate on the issues raised herein and to answer any questions the Commission may have.

Sincerely,

Ronald K. Henry
*Attorneys for NTI*

# **Appendix A**

**Information to be requested of NTI and Peckham**:  A list of the Social Security numbers of all individuals currently employed on their AbilityOne contracts.  Each list should be encrypted in a password protected Microsoft Excel document and emailed to the designated individual at the Commission.

**Information to be requested of Rehab Services Administration**:  The lists from the two CRPs can be forwarded to: Joe Pepin, Unit Data Chief, RSA with a request that he match the two lists of Social Security numbers against their national database of people who have received VR services.  The request is for the <u>percentage</u> of individuals in each of the two lists who have received VR services and who were not receiving SSI and SSDI at the time they received those services.  Excluding those on Social Security disability benefits is to prevent the same individual from being counted twice since a similar request will go to SSA to data match and count those on SSA benefits.  Mr. Pepin's phone number is:  (202) 245-7598.  His email address is: <u>joe.pepin@ed.gov</u>

**Information to be requested of the Social Security Administration**:  The same two lists should be forwarded to Bob Williams, Associate Commissioner for Social Security's Office of Employment Support Programs with a request that the lists be matched against their database of those receiving Social Security disability benefits.  For ease of matching, two types of matches should be requested.  The first is the percentage of individuals on each of the two lists who are receiving Social Security disability benefits (either SSI or SSDI); the second request is for the percentage of people on each of the two lists who have <u>ever</u> received disability benefits.  Mr. Williams email address is: <u>bob.williams@ssa.gov</u>

The information from RSA and SSA is not expected to be definitive in determining the extent to which the two CRPs are hiring from the targeted populations, but it is indicative.  It allows the Commission to see the percentage of employees in the workforce of the two organizations which have been independently verified by a government agency as being severely disabled.  This testing is superior to relying on self-certifications alone.

# EXHIBIT 1

November 6, 2013

To Whom It May Concern:

In the spring of 2010, I contacted Tony Young, staff at NISH, and Andy Houghton, Chair of Ability One Commission, regarding my increasing concerns about a NISH participating Community Rehab Program (CRP), Peckham Industries, and the contracts being awarded to that CRP. Given my intensive work in this area for the last fifteen years, including serving as the Executive Director of the Presidential Task Force for Employment of Adults with Disabilities formed under President Clinton, I suspected that the awardee would be hard pressed to find, recruit and train 75% workers with significant disabilities from Lansing, MI.

Andy arranged a meeting with Tina Ballard, Executive Director of AbilityOne Commission and the staff person responsible for audits. Initially, Andy and I believed that an intensive audit would take place, however, without explanation, no such audit took place.

At that point, Andy suggested that he and I visit Peckham ourselves. Reluctantly I agreed. Andy and I arrived in Lansing, Michigan on July 11, 2010. My reluctance to this visit revealed itself when Peckham staff delivered their agenda for me and Andy. I expressed concern about being pinned up the entire time to Andy and he agreed but was unable to effect change.

The day began with a data slide show showing the numbers of individuals with disabilities living in or around the Lansing area. I stopped the discussion saying I knew the stats, but that wasn't why I had flown at my own expense to Peckham.

We proceeded to discuss the merits and pitfalls of data, when a senior female executive turned to me and asked me how I would handle a situation with an able-bodied woman asking for a job -- trying to feed two children and you had jobs? My response was I would feel bad for the woman, offer her other resources in Lansing, but would not hire her given that the program wasn't intended for people like her. My response was met with palatable disapproval.

Peckham staff relented and took Andy and me on a monitored tour of the staff working on fulfillment of the State Department contract and their Defense Logistic contract. Andy and I saw very few people with visible disabilities. I talked with one female staffer who told me she had been in retail for years and years, but her knees just wouldn't let her stand those long hours, so she came to Peckham for a job sitting down. This struck me as hardly significantly disabled, and many jobs in the mainstream workplace allow you to spend much of your time sitting.

Peckham arranged for three employees with visible significant disabilities to come join us for lunch. They were not scheduled to work that day but were brought in to see Andy and me.

After lunch Peckham took us to their second larger facility, a beautiful, LEED building. This portion of our visit was well monitored as well, but I did manage to wander into a expansive area where I saw approximately 500 people standing at sewing machines. The population resembled a mini-United Nations with languages other than English being spoken. However, not one of them had a visible disability.

Peckham staff re-grouped us in a conference room where Andy and I met Eddie, a Peckham employee. Eddie had prepared remarks which he had used at a congressional reception that he read this to us. After his prepared remarks, Eddie went off script and told me, "I didn't know I was disabled until I got to Peckham."

During this gathering I learned that employees had to meet a quota for production. Eddie's job quota was to sew 125 zippers into military apparel per hour. Eddie didn't outright disclose his significant disability, but it was inferred that Eddie had a mental disability. I have worked intensively with individuals with significant mental disabilities, and given their medications and side-effects not one of them could perform Eddie's quota.

Shortly after this meeting the tour ended, and Andy and I departed for the airport. Due to weather conditions we were delayed, but the time was well spent talking over our observations. Andy agreed that he didn't see many people with visible, significant disabilities. He insisted the way to fix this problem was through his Modernization legislation he was working on. He hoped to have it introduced by the end of summer. His fix was to lower the 75% requirement to 51%. I disagreed stating we had just come from a major CRP that most likely didn't come close to having 51% workers with significant disabilities, so how would this help?

Upon returning Andy and I continued to meet to discuss strategies to address the reality that some CRP's like Peckham were not hiring significantly disabled workers who otherwise could not be competitively employed. Suddenly without warning, Andy was advised by an AbilityOne Commission lawyer that he was to cease conversing with me. Andy reluctantly complied, but not before admitting that things were awry with some CRP's. He truly believed his Modernization legislation would fix it. Fortunately, Congress introduced it but it went nowhere.

Andy left the AbilityOne Commission having not brought about the changes he believed would address the situations we witnessed firsthand at Peckham. While I am confident that there are many CRPs who do hire individuals with significant disabilities who could not be competitively employed in mainstream work, I am also convinced that Peckham is not one of them.

Organizations like Peckham and NCED are a danger to the entire program. I sincerely hope you will take steps to investigate the situation before you have another scandal on your hands. People with severe disabilities are desperately in need of jobs. We need this program strong and serving the population it was intended to serve.

Sincerely,


Becky Ogle

# EXHIBIT 2

# Increased Oversight: A Proposal for the AbilityOne Disability Suitability and Process Committee

**Problem:** Media stories and Congressional Oversight and Government Reform Committees report the perception that the AbilityOne program is not really employing people with severe disabilities. The current program to ensure that SourceAmerica contractors are actually hiring people from the target population is an honor system. The employing CRP can obtain, or pay for; a doctor's note that documents an applicant has a medical condition of some type. A second employee of the same CRP makes a judgment call as to whether the medical condition is so severe that the person can be categorized as "non-competitively employable." As long as a doctor's letter is in a file and the narrative of the staff person making the judgment call is supportive, it is impossible to know if their decision was wrong.

If you cannot detect cheating, how can you gauge whether the honor system is working? Look at the people getting hired. It is not very difficult to measure the extent to which CRPs are hiring people who have been underlined independently verified by a government agency as having a severe disability.

 According to the US Census Bureau 2010 census, when asked if they had a medical condition that made it difficult for them to obtain or keep a job, 14.4 million Americans of working age (7.6% of the working age population) said yes. This 7.6% are the Americans that AbilityOne was designed to employ. Of that 14.4 million, 8.2 million were receiving disability benefits in 2010. (Social Security Administration website)   Thus 57% of the population that CRPs should be targeting was independently verified by the Social Security Administration as being severely disabled in 2010 (see figure 1). This percentage actually increased to 62% by the end of 2011 as the numbers of those on SSDI benefits has grown at a disproportionate rate (Mary Daly and Brian Lucking 2013 *Social Security Insurance Growth: Looking Ahead* 2013).    The 62% of the AbilityOne target population on disability benefits can serve as markers. Their presence in the workforce of a CRP can indicate the extent to which a given CRP is hiring from the targeted population.



If a CRP hired 1,000 employees from the population of severely disabled individuals, one might expect approximately 62% of these workers to be receiving federal disability benefits at the time of hire.  This turns out to be the case for workers hired under National Industries for the Blind (NIB) contracts.  According to a 2009 survey of individuals working for NIB contractors, 66% of NIB employees on AbilityOne contracts were receiving disability benefits (Matthew Wiesel, NIB Aug 2013).

But that does not appear to be the case with SourceAmerica contracts.  Using the number of Tickets reported to the Social Security Administration by six of the top ten SourceAmerica contractors who participated in the Ticket to Work program (see Figure 2)  and comparing the

number of Tickets reported to the number of labor hour worked by their employees,
approximately 2% of their employees were on disability benefits when hired .[1]

## Figure2: TOP 10 SourceAmerica Agencies for Hours

| Nonprofit Agency | AbilityOne Blind and SD Hours Combined | Tickets | Estimated Percent of Workforce who Received Disability Benefit |
|---|---|---|---|
| Peckham Vocational Industries | 3,051,616 | 4 in 2010 | Under 1% |
| The Chimes | 1,326,433 | Did not Participate | |
| Professional Contract Services | 1,311,678 | Did not Participate | |
| Goodwill Industries of South Florida | 1,272,373 | Did not Participate | |
| Goodwill Industries of Southeastern Wisconsin | 1,260,117 | 1 in 2012 | Under 1% |
| ReadyOne Industries | 1,243,184 | Did not Participate | |
| Pride Industries | 1,234,638 | 98 in 2012 | 7% |
| Lakeview Center | 1,189,707 | 16 in 2011 | Under 1% |
| Melwood Horticultural Training Center | 1,080,093 | 9 in 2012 | Under 1% |
| ServiceSource | 1,003,690 | 107 in 2012 | 10% |

Source:  AbilityOne 2011 Performance Results
         Social Security Ticket Program

An examination of figure 3 comparing the estimated percentage of employees on benefits
working under NIB and SourceAmerica contractors shows a striking difference.  Why?

4


## Figure3: Estimated Percentage of Workforce Drawn from Those Receiving Disability Benefits



Sources: **Social Security Ticket to Work Program**
**AbilityOne's 2011 Performance Results**
**2009 Survey of 20% of NIB Employees**

One might hypothesize that perhaps people on disability benefits don't want to work and thus are difficult to recruit.  But according to the 2010 National Beneficiary Survey (Mathematica 2012 Final Report), 31% do want to work and a third of those that want to work manage to find jobs in any given year.  One could further hypothesize that it is hard to find people on disability benefits, but that is not the case either.  In fact the Social Security Administration will readily supply a database of every individual on disability benefits residing within the service area of a given CRP providing the CRP completes the required paperwork to participate in the Ticket Program.  Authorized participants can receive monthly updates with the name, address and phone number of every person on benefits within commuting distance of its locations. The CRP can even specify which disability groups they are willing to serve and Social Security will further

narrow the customized database to beneficiaries in their neighborhood with the medical conditions the CRP considers most compatible with its jobs.

So why do the NIB and SourceAmerica contractor rates differ so much?  A likely explanation involves the hiring standards to which these contractors are held.   NIB contractors make clear-cut disability determination decisions based on explicit degrees of vision loss.  SourceAmerica contractors are given a squishy guideline.

In his book, *The (Honest) Truth about Dishonesty*, behavioral economist Dan Ariely reviews  the research on cheating and concludes that 99% of people do cheat  - with the degree depending upon the situation.  Low probability of getting caught, personal gain, social norms and a good rationale for bending the rules, all have a major influence on how much cheating occurs.  SourceAmerica's squishy guidelines, the pressure to ramp up multi-million dollar contracts on time, the belief that others are also playing fast and loose with the rules, and an understandable desire to help other disadvantaged people sitting right in front of them, eager for jobs, provides fertile ground for the fudge factor.  The longer such fudging goes uncontested, the more likely it becomes the social norm.  CRPs that push the envelope, that violate the honor system and still prosper, provide models for other CRPs to emulate.  They lead the whole program in a direction it was never meant to go.

**A proposal for Increased Oversight**:  Ticket assignments numbers provide one indication of the extent to which participating CRPs are hiring from the target population, but better methods are available.   It is relatively easy to measure the percentage of every CRP's employees that have <u>ever</u> been on Social Security Disability benefits at any time, or who have received services from their State VR agency.   Collectively the Social Security Administration and State VR agencies have independently verified as severely disabled <u>more than 62% of the targeted AbilityOne population.</u>  As long as the goal is research or program improvement, both databases are available to authorized users. [2]

 Hundreds of ENs and state VR agencies already use the SSA beneficiary database via a secure portal.  SSA and the Office of Personal Management are currently exploring a data sharing arrangement that will allow OPM to learn the degree to which each federal agency is hiring

people who have been on disability benefits. OPM's goal is to establish a baseline against which federal agencies can then measure progress.  All data will be shared in the aggregate; no individual beneficiaries are identified.

Having the Social Security Administration match the Social Security numbers of employees at CRPs can provide a solid independent indicator of the extent that any given CRP is hiring from the target population.

## Benefits of using an independent measure of compliance:

**More effective compliance monitoring:** Just as the IRS uses feedback from third parties along with algorithms to alert them to suspicious tax returns, suggestive patterns from the Social Security Administration's database could allow Commission compliance efforts to focus on those CRPs with the lowest percentage of markers. Just as a red flag on a tax return does not mean a tax payer is guilty of tax evasion, a low percentage does not necessarily mean abuse of the honor system.  But it should trigger some probing questions.

**An incentive to find the targeted population:**    Measurement of markers will almost certainly result in increased interest by CRPs to recruit those people who have self-identified to the government as having disability-related work challenges.   Further incentives can be provided by SourceAmerica if the recruiting success of CRPs (indicated by the percentage of markers in their workforce) becomes a factor in CRP selection decisions.

**Means by which contractors can measure their progress:** Providing CRPs with an objective measure by which they can assess improvement in their hiring practices puts competitive pressure on all SourceAmerica contractors.  Those that rank high while satisfying their federal customers should thrive and provide models for others to emulate.  Some CRPs may undergo a much-needed adjustment in recruiting focus, thus benefiting people with severe disabilities as well as the American taxpayer.

**Disaster avoidance:** The National Center for Employment of the Disabled (NCED) used to be SourceAmerica's largest CRP, with $275 million in annual AbilityOne contracts.  NCED blatantly abused the honor system for years until they became the target of media and Department of

Justice scrutiny.  Much damage was done to the reputation of the AbilityOne program when it was revealed that fewer than 8% of NCED employees were actually people with severe disabilities.  The fact that NCED routinely passed its annual NISH audits was a vivid illustration of just how ineffective those audits are.  A reality check like the one suggested in this proposal would have red-flagged NCED immediately.

The use of an honor system as the sole method of compliance monitoring does an injustice to all the CRPs and their employees who are relying on the Commission to keep them safe from the future scandals.  The consequences of more scandals, particularly in the current climate, could be disastrous for the entire program.

[1] Six of the top ten SourceAmerica contractors elected to participate in the Social Security Administrations Ticket to Work program and thus their reported Ticket assignment numbers are public information.  On average, fewer than 2% of employees at the six participating CRPs appear to be on disability benefits.  No conclusions concerning any given CRP should be drawn without confirmation that the numbers they've reported to the Social Security Administration are an accurate reflection of the  number of beneficiaries they are employing.

[2] The legal authority for data sharing  is section 1110 of the Social Security Act (Act) (42 U.S.C. § 1310), which provides SSA authority to enter into contracts to conduct research that will help improve the administration and effectiveness of programs carried on or assisted under the Act.  Section 702 of the Act (42 U.S.C. § 902) provides the Commissioner of Social Security general authority to administer the Act. SSA regulations promulgated at 20 CFR § 401.165(a) authorize SSA to release information for statistical or research purposes in aggregate form.

**Contact:**

 MJ Willard, Ed.D
Executive Director
National Telecommuting Institute, Inc
103 E. Blithedale Ave  Suite 9
Mill Valley, CA  94941
(415) 389-1703

mjwillard@nticentral.org

# EXHIBIT 3



**NEWSPAPER**
**TREE**

July 1, 2009

# A Bob Jones guilty plea serves justice only if it leads investigators to Washington

**by David Crowder**

At a federal court hearing last month, we learned that Robert E. "Bob" Jones, the former CEO and president of El Paso's National Center for Employment of the Disabled, was negotiating for a plea bargain to charges made against him in a 37-count indictment issued in October 2008.

A guilty plea by Jones would relieve the government of the need to mount a massive case for a trial on the charges that he masterminded a huge criminal scheme that made him rich while stealing tens of millions of dollars from NCED, a nonprofit since renamed ReadyOne Industries, and defrauding the federal government of hundreds of millions.

But it could also mean the complete story behind the biggest single scandal in El Paso's history will go untold and that the complicity or incompetence of the federal agencies that were supposed to be watching over NCED and other charities involved in a $600 million program to employ severely disabled workers will remain untouched and unaccountable.

It all depends on the earnestness and reach of the FBI and the U.S. attorney's office and whether their investigation has traveled beyond El Paso to Washington and outward to other nonprofits that are part of the federal Javits Wagner O'Day Program.

So far, the federal investigators have not let El Paso down. Their public corruption investigation has gone where no other law enforcement agencies have dared in digging up corrupt officials and companies.

At this writing, there are new rumors going round and tips from old reliable sources coming in that dozens more indictments in the NCED case are on their way.

The question is whether that investigation will go as high up the ladder as it does wide into our community.

Jones was indicted last October along with Pat Woods, the former chairman of NCED's board of directors, and the company's former chief operating officer, Ernie Lopez. But they were hardly alone in knowing about and participating in NCED's schemes.

Back in 2005, Jones was at the top of his game, a giant in business circles whose esteem and popularity sprang from huge contributions of NCED's money to the city's charities and community causes.

In October of that year, the Greater El Paso Chamber of Commerce named him Entrepreneur of the Year despite growing and persistent reports that something was terribly wrong at NCED. It is an award the chamber surely wishes it hadn't made but one the city's leading business organization has not retracted.

The same month, after a Senate committee hearing into the huge salaries going to executives running charities in the Javits Wagner O'Day Program, Jones was singled out as the worst offender for the $4.6 million NCED had paid in 2003 to JFT Management, which he owned.

NCED's 2005 income tax return showed Jones received more than $9 million for running a nonprofit charity.

Flush with millions of dollars in compensation from the company and from deals he made with the charity's money, Jones was generous to El Paso politicians, who were happy to accept his donations.

And why not? In his 12 years as CEO, he had taken NCED from a struggling nonprofit with 50 workers making government boxes under contracts to provide jobs to the severely disabled to a 4,000-employee empire with defense department contracts totaling more than $250 million.

In the run-up to the war in Iraq and Afghanistan, NCED's main product went from cardboard boxes to chemical warfare protective suits for soldiers. Once the shooting started, the set-aside, no-bid contracts kept on coming, getting bigger and bigger.

Although severely disabled workers were supposed to be doing 75 percent of the labor going into those high-tech, hard-to-make battle suits, they had to be free of defects, and they had to come off NCED's assembly lines fast.

They did, under the flying hands of expert sewers whose jobs with Levi Strauss and other El Paso garment makers had gone south and left them behind. Could the equivalent of 3,000 severely disabled workers have managed NCED's demanding production quotas?

Granted, the Javits Wagner O'Day Program's definition of severely disabled differs from any conventional understanding and generally means any physical or mental disability that keeps someone from being able to find a job.

At NCED, that could mean being a disadvantaged Spanish-only speaker.

Many wondered how NCED was getting away with it and who was helping, but those questions were quietly swept away again and again.

Those sitting on Jones' NCED board were mostly out-of-towners, including former generals who knew their way around the Pentagon and people with influence who knew their way around Washington and the JWOD Program.

Overseeing the JWOD Program was the Committee for Purchase from People Who Are Blind or Severely Disabled, an independent federal agency whose members were all presidential appointees. A retired Air Force general headed the agency.

In May 2005, an anonymous letter to the Committee for Purchase from El Paso charged that fewer than 10 percent of NCED's workers were actually disabled. That prompted a hasty and brief investigation in July in which a Committee for Purchase investigator, Lou Bartalot, found payroll records showing NCED had combined disabled and disadvantaged workers to reach the 75 percent ratio of work by severely disabled workers.

Bartalot's finding showed NCED was flagrantly violating federal standards for the JWOD Program. But the investigation was closed in September after a review of the company's records by NISH, a federally chartered nonprofit charged with the immediate oversight of JWOD contractors, gave NCED a clean bill of health.

A small agency, NISH is funded not by Congress but by a 4 percent fee based on the contract proceeds received by the nonprofits it is charged with overseeing. NCED, the crown jewel of the JWOD program, had more than $250 million in contracts in 2005. That meant more than $10 million to NISH, so what was a poor conflicted agency expected to do to that golden goose?

It took an El Paso Times article in November 2005 about NCED's violations to start a new investigation that led NISH and the Committee for Purchase to conclude months later that NCED had purposefully violated the law for years and should be expelled from the JWOD program. It wasn't.

As it happens, Bartalot had found the same problem at NCED – combining labor by disabled and disadvantaged workers – in 2000 but brushed it off as a minor misunderstanding of the JWOD regulations.

In the aftermath of the scandal at NCED, JWOD's biggest contractor ever, about the only thing that changed in Washington was the program's name. Soon after NCED changed its sullied name to ReadyOne, the Committee for Purchase changed JWOD's name to AbilityOne.

If the FBI has opened an investigation of NISH, the Committee for Purchase, their officials and employees or executed warrants to search their offices, bank accounts or homes, or obtained indictments or guilty pleas, it has not been reported in the three years since the raid on NCED.

* * *

*To reach David Crowder, write to dcrowder@epmediagroup.com or call (915) 351-0605, ext. 30, or 630-6622.*