# In the United States Court of Federal Claims

No. 15-293C

(Filed Under Seal:  October 14, 2015)

(Reissued for Publication: October 28, 2015)

```
*******************************************
NATIONAL TELECOMMUTING                     *
INSTITUTE, INC.,                           *
                                           *
                        Plaintiff,         *
v.                                         *
                                           *
THE UNITED STATES,                         *  Post-award Bid Protest; AbilityOne
                                           *  Program; Javits-Wagner-O'Day Act;
                        Defendant,         *  Delay in Filing Protest; Laches;
                                           *  Reasonableness of Evaluation and
PECKHAM VOCATIONAL INDUSTRIES, INC.,*  Selection of Awardee; Judgment on
                                           *  the Administrative Record.
and                                        *
                                           *
SOURCEAMERICA,                             *
                                           *
                        Defendant-Intervenors. *
                                           *
*******************************************
```

*Ronald K. Henry*, with whom were *David Hibey* and *Robert J. Wagman, Jr.*, Kaye Scholer LLP, Washington, D.C., for Plaintiff.

*Christopher L. Harlow*, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Timi Nickerson Kenealy*, General Counsel, Committee for Purchase from People Who are Blind or Severely Disabled, and *Antonio T. Robinson*, Office of General Counsel, U.S. Department of Agriculture, Of Counsel, for Defendant.

*Meghan A. Douris*, Oles Morrison Rinker & Baker LLP, Seattle, Washington, for Defendant-Intervenor Peckham Vocational Industries, Inc.

*Sarah L. Wilson*, with whom were *J. Chase Johnson, Jeffery T. Bozman*, and *Z. Lily Rudy*, Covington & Burling LLP, Washington, D.C., for Defendant-Intervenor SourceAmerica.

OPINION AND ORDER[1]

WHEELER, Judge.

In this bid protest, Plaintiff National Telecommuting Institute ("NTI") challenges the award of a U.S. Department of Agriculture ("USDA") help desk services contract to Peckham Vocational Industries ("Peckham"). The Government conducted this procurement under the AbilityOne Program established by the Javits-Wagner-O'Day ("JWOD") Act, 41 U.S.C. §§ 8501-8506, to provide jobs for individuals with severe disabilities. The AbilityOne Commission is an independent federal agency created to administer the AbilityOne Program. See 41 U.S.C. § 8502. The Commission is responsible for determining which products and services should be furnished to the Government by people who are blind or severely disabled. A central nonprofit agency known as SourceAmerica functions as a technical evaluation panel and makes recommendations to the Commission on the qualifications and abilities of prospective nonprofit agencies to perform the work.

This particular procurement has a long history, beginning in April 2013. There have been multiple administrative appeals before SourceAmerica and the AbilityOne

---

[1] The Court issued this decision under seal on October 14, 2015 and invited the parties to submit proposed redactions of any competitive-sensitive, proprietary, confidential, or other protected information on or before October 21, 2015. By that date, Defendant-Intervenor SourceAmerica, on behalf of itself, Defendant-Intervenor Peckham, and the Government, requested only minimal redactions of identifying non-party bidder information and source selection evaluation criteria, while Plaintiff National Telecommuting Institute asked for extensive redactions of source selection evaluation commentary, along with the Court's own factual findings and legal conclusions. In an effort to resolve redaction issues, the Court requested NTI to submit a memorandum explaining the basis for its redactions by October 26, 2015. NTI filed its memorandum on October 26, 2015, and SourceAmerica, on behalf of itself, Defendant-Intervenor Peckham, and the Government, responded on October 27, 2015.

The reason for redaction "is to safeguard the competitive process, not to withhold information that a party frowns on making public." Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 723 (2010). When considering redactions, the better approach is to honor the "presumption of public access to judicial records." Baystate Techs., Inc. v. Bowers, 283 F. App'x 808, 810 (Fed. Cir. 2008) (citing Siedle v. Putnam Invs., Inc., 147 F.3d 7, 9 (1st Cir. 1998); Poliquin v. Garden Way, Inc., 989 F.2d 527, 533 (1st Cir. 1993)); see also Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 131-33 (2010); Akal Sec., Inc. v. United States, 87 Fed. Cl. 311, 314 n.1 (2009). After considering NTI's explanations in support of its proposed redactions, the Court agrees it is appropriate to redact certain source selection evaluation commentary. These redactions are indicated in the decision by brackets and three asterisks, [***]. However, NTI also proposes to redact this Court's own factual and legal analysis where it reflects poorly on NTI. Omitting such information would not serve to safeguard the competitive process, but rather would serve to shield NTI from unfavorable commentary. The Court finds that it is neither necessary nor appropriate to redact its decisional reasoning containing no protected information.

Commission, and a reevaluation of proposals in accordance with the Commission's instructions. For the reasons explained below, the Court finds that NTI's protest is barred under the doctrine of laches. A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (en banc); Clinton Reilly v. United States, 104 Fed. Cl. 69, 78-80 (2012). NTI waited six months after the official notice of award, and nearly ten months after it had exhausted its agency appeals, before filing its bid protest. The awardee, Peckham, and the Government suffered significant prejudice from NTI's delay in bringing the protest.

Putting NTI's laches problem aside, the protest also fails on the merits. The Court finds that SourceAmerica rationally evaluated the proposals, and determined that Peckham's proposal was far superior to NTI's. SourceAmerica adhered to the reevaluation instructions mandated by the Commission. NTI's complaints about the procedures followed during the reevaluation are not supported by the administrative record. Accordingly, NTI's protest is DENIED.

## Background

NTI is a not-for-profit organization providing telecommuting job opportunities for severely disabled individuals who are unable to work outside the home. Compl. ¶ 13. Joining the Government in defending against NTI's protest are SourceAmerica, the designated central nonprofit agency, and Peckham, the selected awardee for the contract at issue. SourceAmerica and Peckham are Defendant-Intervenors.

A. Statutory and Regulatory Framework

Through the JWOD Act, Congress created the Committee for Purchase from People Who are Blind or Severely Disabled ("Committee" or "Commission") to administer the AbilityOne Program ("AbilityOne" or "Program"). 41 U.S.C. §§ 8502-03. The Committee consists of fifteen presidential appointees representing various federal agencies as well as the blind and severely disabled communities. Id. at § 8502; 41 C.F.R. § 51-1.3. The Committee's mandate is to identify programs and services furnished by qualifying nonprofit agencies that are suitable for government procurement. Congress also directed the Committee to designate central nonprofit agencies to assist in maintaining the Procurement List and to evaluate the suitability of qualifying nonprofit agencies. 41 U.S.C. § 8503(c). Under this mandate, the Committee selected National Industries for the Blind and SourceAmerica, previously named National Industries for the Severely Handicapped, as its designated central nonprofit agencies.

Once the Committee determines that a good or service is suitable for procurement from a qualified nonprofit agency, the Committee places that item on a published Procurement List and any federal agency wishing to obtain that item must do so through a qualified nonprofit agency. The Act lists specific requirements and conditions nonprofit

agencies must satisfy to participate, and requires the Committee to maintain and publish in the Federal Register the list of products and services deemed suitable for procurement through the Program. The Act does not define the suitability standard, but states that the Committee "may prescribe regulations regarding specifications for products and services on the procurement list . . . and other matters as necessary to carry out this chapter." 41 U.S.C. § 8503(c). As discussed below, the Committee promulgated regulations establishing four mandatory criteria to determine a commodity's or service's suitability for the Procurement List. 41 C.F.R. § 51-2.4(a)(1)-(4) "Determination of suitability."

The Program's statutory and regulatory framework creates a multi-step process by which potential AbilityOne goods and services are identified and assessed. The statute and regulations also create a three-tiered framework for evaluating the ultimate suitability of a given addition to the Procurement List. Along with the Committee, SourceAmerica, in its role as the central nonprofit agency coordinating employment opportunities for the severely disabled, assesses federal contracting activities for compatibility with the AbilityOne Program, obtains procurement information from federal contracting entities, evaluates submissions from interested nonprofit agencies, and makes recommendations to the Committee. Once the Committee receives SourceAmerica's recommendation, the Committee's executive staff conducts its own review of the submissions and makes an independent recommendation to the Committee's presidentially-appointed members. The Committee members then consider the "particular facts and circumstances in each case" before deciding whether the good or service should be added to the Procurement List. 41 C.F.R. § 51-2.5.

B. Procurement Process

After the USDA Forest Service posted a Request for Information ("RFI") for IT helpdesk services support ("HelpDesk Services") on October 30, 2012, SourceAmerica approached the Forest Service to discuss whether the HelpDesk Services project might be sourced through the AbilityOne Program. Gov't Mem. at 6. The USDA then contacted Ryan Blackman, SourceAmerica's Senior Deputy Director for Strategy Development, in early February, 2013, to discuss transitioning the helpdesk call center to an AbilityOne opportunity. SourceAmerica ("SA") Mem. at 8. Once the USDA Secretary and Chief Information Officer confirmed that the HelpDesk Services could be sourced through the AbilityOne Program, SourceAmerica created Sources Sought Notice ("SSN") 2000 for distribution among qualified nonprofit agencies.

On April 8, 2013, SourceAmerica published SSN 2000 and its evaluation team began reviewing bid proposals in early May. Mr. Blackman hired two independent contractors to offer technical advice to ensure accurate assessment of the technical elements of the proposals. Although Mr. Blackman continued to facilitate the relationship between the independent contractors and SourceAmerica's evaluation team, Mr. Blackman was not a member of the evaluation team. The SSN 2000 team completed its evaluation

matrices on May 6, 2013, with every evaluator recommending Peckham for the HelpDesk Services opportunity.  SA Mem. at 12.  Although NTI received no first rankings, it did rank second or third with a majority of the evaluators.  Following SourceAmerica's Executive Director's recommendations, on May 23, 2013, Peckham and NTI presented their proposals to the USDA and answered key questions submitted to SourceAmerica by the USDA.  Id.  After submitting additional questions and independently analyzing the proposals, the USDA's sixteen-member team agreed with SourceAmerica, recommending that Peckham perform the HelpDesk Services.  Id. at 13.

Following a debriefing with SourceAmerica's Executive Director, NTI filed two appeals with SourceAmerica, both of which were denied.  Id. at 14-15.  NTI appealed these denials to the Commission and, through its Executive Director Tina Ballard, the Commission ultimately sustained NTI's appeal on the ground that SourceAmerica "failed to follow its established policies and procedures by evaluating NTI on criteria that was [sic] not included in the Source Selection Notice #2000, dated April 29, 2013."[2]  Pl. Mem. at 8 (quoting SA 1756).[3]

After granting NTI's appeal on December 20, 2013, Ms. Ballard remanded SSN 2000 to SourceAmerica "for appropriate action."  Administrative Record ("AR") 2885.  To ensure a fair and unbiased second evaluation, Ms. Ballard "instructed SourceAmerica to re-do their NPA recommendation," giving the agency the following guidelines:  "(1) SourceAmerica should create another Sources Sought Notice using the original Statement of Work and identical posting questions; (2) SourceAmerica should establish an evaluation team of SourceAmerica staff members who were not involved in the first posting; (3) [t]he SourceAmerica Executive Director making the recommendation should not have been involved with the first posting; and (4) [create a] 'firewall' between the first posting and the second posting [] so no one on the new team has access to any of the details of responses to first posting or any evaluation details."  Id. 94.

SourceAmerica posted SSN 2333 on Friday, January 3, 2014.  Id. 1500-03.  The second solicitation stated that the "project was under a tight timeframe."  Id. 1500.  On Friday, January 17, 2014, SourceAmerica received proposals from three bidders.[4]  Id. 2202-2410.  After receiving these proposals, the new evaluation team "immediately began its evaluations and was exclusively devoted to this task."  SA 1887.  The evaluations and ultimate recommendation from the SSN 2333 team that Peckham was the most qualified nonprofit agency for the HelpDesk Services opportunity matched those "of every

---

[2] SSN 2000 "involved 6 versions issued between April 8, 2013 and April 29, 2013."  Peckham Mem. at 3.

[3] Due to the fact that SourceAmerica was responsible for evaluating proposals and making recommendations to the Commission, the Court required SourceAmerica to produce documents relating to the evaluations.  The Court considered these SourceAmerica documents part of the record on review.

[4] The third bidder, [***], was not competitive but wanted to be considered as a subcontractor/mentee.

individual who and organization that assessed the competing proposals of Peckham and NTI over the course of two years." SA Mem. at 2. SourceAmerica notified the bidders of the outcome of the SSN 2333 evaluation on January 23, 2014, and debriefed NTI six days later on January 29, 2014. AR 2646-45.

NTI immediately initiated the appeal process, filing ultimately unsuccessful first and second-level internal appeals with SourceAmerica on February 6 and March 4, 2014. Id. 256, 265. NTI then appealed to the AbilityOne Commission on April 4, 2014. Id. 131-43. The Commission, acting again through Ms. Ballard, denied NTI's appeal on May 29, 2014, at which time NTI's agency appeals were exhausted. Id. 152. Following a notice and comment period, the Commission published the USDA HelpDesk Services in the Federal Register on August 15, 2014, placing the contract with Peckham "on the Procurement List to be awarded on September 15, 2014." Peckham Mem. at 11. Shortly after the August 15 final publication, Peckham began contract performance, which "include[d] a transition period during which the previous service provider [IBM] remained in place. On March, 20, 2015, NTI initiated this bid protest, just days before Peckham was scheduled to assume full responsibility for contract performance." Gov't Mem. at 9.

C. Procedural History

Counsel for NTI filed this judicial post-award challenge on March 20, 2015, protesting the USDA HelpDesk Services award to Peckham and requesting declaratory and injunctive relief. On March 25, 2015, Peckham filed a motion to intervene, which the Court granted the next day. During a hearing on March 26, 2015, Counsel for NTI successfully applied for a Temporary Restraining Order ("TRO") to enjoin the Government from allowing Peckham's performance for fourteen days. On April 2, 2015, after briefing and oral argument, the Court granted Peckham's motion to dissolve the TRO. On April 10, 2015, the Court granted SourceAmerica's motion to intervene in this case.

On July 8, 2015, NTI filed a motion for judgment on the administrative record and a permanent injunction. On July 29, 2015, the Government and Intervenors each filed an opposition to Plaintiff's motion and a cross-motion for judgment on the administrative record. The parties have fully briefed their respective motions, and on September 15, 2015, the Court heard closing arguments. After carefully considering the parties' positions, the Court concludes that NTI's claims are time-barred and that, in the alternative, the Government is entitled to judgment on the administrative record.

Discussion

A. Standing

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, this Court has "jurisdiction to render judgment on an action by an interested

party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  Determining whether a bid protester has standing to pursue a claim in this Court "is a threshold jurisdictional issue" that must be met in any protest.  Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-04 (1998)).  To establish standing under the Tucker Act, an aggrieved protester must demonstrate that it is an "interested party" by showing that it is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2) (Supp. IV 1998)).

Neither the Government nor the Intervenors dispute that NTI has standing to pursue this action.  Indeed, the Court agrees that NTI is an interested party within the meaning of the relevant statute and therefore has standing.  NTI is an actual offeror and submitted a technically acceptable proposal.  NTI submitted timely proposals for both SSN 2000 and SSN 2333, and was one of only three offerors evaluated by SourceAmerica and the Commission during the second evaluation process.  Pl. Mem. at 13.  Only NTI and Peckham proceeded beyond the initial qualifying assessment such that both were "within the zone of competition" for the HelpDesk Services opportunity.  Holloway & Co., PLLC v. United States, 87 Fed. Cl. 381, 391 (2009).

B. Laches

In its cross-motion for judgment on the administrative record, Peckham asserts the equitable defense of laches.  Peckham Mem. at 25-27.  The doctrine of laches "bars a claim when a plaintiff's 'neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party.'"  Land Grantors in Henderson, Union, & Webster Counties v. United States, 86 Fed. Cl. 35, 47 (2009) (quoting A.C. Aukerman Co., 960 F.2d at 1028-29).  As this Court has explained, the doctrine of laches "is premised on the maxim *vigilantibus non dormientibus aequitas subvenit*–equity aids the vigilant not those who slumber on their rights."  Mississippi Dep't of Rehab. Servs. v. United States, 61 Fed. Cl. 20, 30 (2004) (citing Cornetta v. United States*,* 851 F.2d 1372, 1375 (Fed. Cir.1988)).  Laches may be invoked as an affirmative defense in the context of a bid protest before this Court.  See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1314-14 (Fed. Cir. 2007); see also Software Testing Solutions, Inc. v. U.S., 58 Fed. Cl. 533, 536 (2003).

A laches defense requires that a defendant show "(1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party, either economic prejudice or defense prejudice."  JANA, Inc. v. United States, 936 F.2d 1265, 1269 (Fed. Cir. 1991); see also Hermes Consol., Inc. v. Unites States, 58 Fed. Cl. 3, 20 (2003).  Ultimately, the

defendant bears the burden of establishing that "the plaintiff delayed in filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant" and that this "delay operated to the prejudice or injury of the defendant." A.C. Auckerman Co., 960 F.2d at 1032.

      1.  Delay

SourceAmerica notified Peckham and NTI of the outcome of SSN 2333 via email on January 23, 2014, and debriefed NTI on January 29, 2014. AR 2642-45. NTI filed first and second-level appeals with SourceAmerica on February 6 and March 4, 2014. Id. 256, 265. After losing both internal appeals, NTI appealed to the AbilityOne Commission on April 4, 2014. Id. 131-43. Following a review of NTI's allegations and meetings with both NTI and SourceAmerica, the Commission, acting through Ms. Ballard, denied the protest on May 29, 2014. Id. 152. After a period of public notice and comment, the Commission added Peckham to the Procurement List on September 15, 2014. NTI filed the present action on March 20, 2015, more than six months after the Commission finalized the award to Peckham, more than eight months after NTI exhausted its administrative appeals, and more than a year after SourceAmerica announced the outcome of SSN 2333.

This Court has explained that a plaintiff cannot sit on his rights in bringing a bid protest while the Government moves forward with a contract. See, e.g., Benchmark Knife Co. v. United States, 79 Fed. Cl. 731, 737 (2007) (citing Blue & Gold Fleet, 492 F.3d at 1314). To this end, this Court has found a "strong argument in favor of applying laches" when a plaintiff chose to wait two months to file suit because he was weighing the cost of litigation. Software Testing Solutions, Inc. v. United States, 58 Fed .Cl. 533, 536 (2003). In this case, NTI waited more than three times as long to bring this bid protest.

NTI offers two primary justifications to explain its delay, both of which are unpersuasive. First, NTI explains that it waited until March 2015 to bring its protest before this Court because it chose to attempt to work directly with the USDA. See, e.g., Sept. 15, 2015 Closing Arg. ("Tr.") at 33-34; accord Dkt. No. 1-2 (MJ Willard Declaration ¶ 27) ("Since the SSN was placed on the Procurement List on September 15, 2015, [sic] I have been seeking relief directly from the USDA."). Second, NTI explains that, due to its modest size and nonprofit status, it wanted to seek less expensive means of relief before litigating this matter. See, e.g., Tr. at 33 ("NTI is a small nonprofit. The idea of rushing into court prematurely and expensively is a very difficult undertaking for them so they attempted everything they could think of prior to going into court."), id. at 34 ("So, you had two components to it. One is it's expensive to be here. . . .").

The Court does not quarrel with NTI's claims that it was attempting to seek relief through informal channels and by less expensive means. However, in choosing to rely on such alternative efforts, rather than timely filing a bid protest, NTI "simply chose to put all [its] eggs in one basket—ultimately to [its] detriment." Reilly, 104 Fed. Cl. at 80; see also

Tr. at 34 ("The reason we had to file in March . . . was because we suddenly got word that those discussions had been a waste of time and Peckham was preparing to launch a startup of services."). While NTI was attempting to avoid the cost of litigation, the USDA and Peckham were proceeding with the call-center contract at a significant cost to both parties.

### 2. Prejudice

As this Court has explained, the "[m]ere passage of time does not constitute laches." <u>Mississippi Dep't</u>, 61 Fed. Cl. at 30. To prevail, the defendant must also show how the plaintiff's delay in bringing a claim caused the defendant to suffer prejudice. In the case of a bid protest, "[a] plaintiff may choose to sit on his rights while a government contract proceeds, but he will be barred from protesting if the Government is prejudiced as a consequence." <u>Reilly</u>, 104 Fed. Cl. at 80; <u>see also</u> 30A C.J.S. Equity § 138 ("Laches is not based merely upon time, but also upon changes in conditions or relationships involved with the claim, and the consequent inequity of permitting the claim to be enforced.").

In the present case, NTI's decision to sit on its right to bring this claim for six months directly and substantially prejudiced both Peckham and the Government. Peckham has "incur[red] millions of dollars in costs that remain unreimbursed pending this bid protest." Peckham Mem. at 26; <u>see also</u> Tr. at 156 ("Peckham has had to outlay resources for its facilities, outlay resources for the training program, for the software."). Also, the Government has incurred and will continue to incur substantial costs pending resolution of this matter. NTI's delay has forced the USDA to extend its contract with incumbent IBM. <u>See</u> Peckham Reply at 14 (explaining that the USDA is holding the launch of its contract with Peckham "due to the TRO that was issued in this case, and its impacts after only one week."). Finally, pending a result in this case, task orders that should have gone into effect in July remain on hold. <u>Id.</u> at 15; <u>see also</u> Tr. at 156 (explaining that two of the four USDA IT task orders remain unimplemented pending resolution of this matter).

For these reasons, the Court finds that application of the laches doctrine is appropriate in this case. NTI could have brought this action as much as six months before it did so and its justifications for the delay are inadequate. As a result of NTI's delay, both Peckham and the Government have suffered economic prejudice, much of which could have been avoided had NTI brought a timely bid protest.

### C. Judgment on the Administrative Record

### 1. Standard or Review

In a bid protest, this Court reviews an agency's decision pursuant to the standards set forth in the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-706 (2000); <u>see also</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (stating that the APA standard of review shall apply in all procurement protests in the Court of Federal Claims). Under the APA, a reviewing court shall set aside

an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see, e.g., Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004).

The APA standard allows this Court to set aside an agency's procurement decision if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. Impresa, 238 F.3d at 1333.  When evaluating a challenge on the first ground, a court "must determine 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.  When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.'" Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting Impresa, 238 F.3d at 1332–33 (Fed. Cir. 2001)).  If the Court determines that an agency acted without a rational basis or contrary to law, it must then determine whether "the bid protestor was prejudiced by that conduct." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  The plaintiff must show prejudice by demonstrating "that there was a substantial chance it would have received the contract award but for [the agency's procurement] error." Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (internal citation omitted); see also Bannum, Inc. 404 F.3d at 1353.

In its motion for judgment on the administrative record and permanent injunction, NTI protests the second evaluation process of proposals for the USDA HelpDesk Services opportunity on three grounds.  First, NTI contends that SourceAmerica failed to follow each of four guidelines from Ms. Ballard in conducting the second evaluation, resulting in an arbitrary and capricious evaluation process that prejudiced NTI.  Second, NTI argues that the Commission erred in determining Peckham was a suitable, qualified nonprofit agency. Pl. Reply at 25.  Finally, NTI contends that it was unreasonable for SourceAmerica and the Commission not to consider AbilityOne's policy goal of maximizing employment opportunities. Pl. Mem. at 22.  The Court will address each of NTI's arguments below.

For the reasons explained, NTI has failed to meet its burden on any of its protest grounds and, in fact, the administrative record instead supports judgment in the Government's and Intervenors' favor.  Specifically, SourceAmerica and the AbilityOne Committee's decision to award this contract to Peckham was reasonable, coherent, and rational based on the record evidence.  Moreover, the reevaluation process adhered to the specific procedures articulated by Ms. Ballard as well as the four-factor regulatory framework.

## 2.   SourceAmerica Followed the Guidelines for the Second Evaluation and Conducted a Fair and Lawful Reevaluation

After sustaining NTI's first appeal based on its claim that SourceAmerica "evaluat[ed] NTI on criteria that was not included in the Source Selection Notice #2000,"

Ms. Ballard returned the IT project selection decision to SourceAmerica "for appropriate action." SA 1756. A July 21, 2014 Commission staff synopsis summarizes Ms. Ballard's instructions to SourceAmerica regarding SSN 2333, the second evaluation for the USDA HelpDesk Services opportunity. The synopsis is a post-hoc description of the instructions for the second evaluation and the parties disagree as to the weight this summary should be given. Tr. at 74-75 ("There's been some debate between NTI and the intervenors . . . because AR 94 is an after-the-fact memorialization of the instructions. The intervenors are absolutely correct on that. . . . But NTI is also right that it represents the instructions. These are the instructions of SourceAmerica."). The Court deems it unnecessary to decide whether the guidelines are directions or an after-the-fact summary because, either way, SourceAmerica conducted the second evaluation process in accordance with each of the four Commission guidelines.

Based on these guidelines, NTI argues that the evaluation process was arbitrary and capricious because SourceAmerica failed to: (1) issue an identical posting; (2) establish an evaluation team of members who were not involved in the first posting; (3) select an evaluation official who was not involved in the first posting; and (4) create a firewall between the first and second postings so new team members could not access evaluation or response details from the first posting. AR 94.

a. SourceAmerica Issued a Substantively Identical Posting

The first Commission guideline instructed SourceAmerica to "create another Sources Sought Notice using the original Statement of Work and identical posting questions," because Ms. Ballard determined SourceAmerica evaluated the SSN 2000 proposals using criteria not explicitly listed in the notice. Id. 94. To address this concern, SourceAmerica prepared SSN 2333 so that all of the substantive factors considered during the first evaluation process were explicitly listed in the text of SSN 2333.

As the evaluation of proposals for SSN 2000 proceeded, the USDA posed additional questions and its user requirements changed, which in turn led to changes in the Commission's suitability analysis. Gov't Mem. at 28. For example, on June 11, 2013, both NTI and Peckham received an email with three questions that then became part of SSN 2000. Tr. at 75. In drafting SSN 2333, the staff at SourceAmerica deliberately added these three questions (as Response Requirements 7, 8, and 10) to the notice to ensure that it accurately reflected the substantive evaluation criteria considered during the first evaluation. SA Reply at 14. NTI claims that these changes make the second evaluation substantially different from the first.

NTI's contention that SourceAmerica made impermissible changes to SSN 2333 is simply without merit. The information sought by Response Requirements 7, 8, and 10 was requested from NTI and Peckham during the first evaluation process. NTI provided this information during that process by answering the USDA's and SourceAmerica's additional

questions. Had SourceAmerica issued an identical posting, it would have been disregarding Ms. Ballard's first guideline for conducting the second evaluation process. See id. at 14 ("No rational participant in a procurement would expect SourceAmerica to simply re-title SSN 2000 as SSN 2333 and repeat the evaluation process. Doing so would have clearly violated the purpose and intent of Ms. Ballard's December 20, 2013 remand letter."). Instead, in drafting the second posting, SourceAmerica took steps to clarify and make explicit all evaluation criteria that it considered during the first evaluation.

NTI places form over substance by arguing SourceAmerica should have drafted SSN 2333 in a way that effectively did not reflect the actual contract opportunity SSN 2000 had become by the time the first evaluation period ended. Id. ("Re-posting verbatim Sources Sought Notices would have been irrational and unreasonable."). Instead, SourceAmerica incorporated the June 13, 2013 questions relating to subcontracting and financial stability directly into the SSN 2333 posting. AR 1503; see also Tr. at 121 ("[T]hey made it express, that there could be absolutely no question, no room for misunderstanding, that the subcontracting requirements . . . included in the questions responded to by both NTI and Peckham in the SSN 2000 process, were also part of the 2333 process, and they incorporated question about the financial stability issue.").[5]

Lastly, SourceAmerica "expanded upon the criterion regarding [nonprofit agency] management" in part because NTI itself requested such guidance following SSN 2000. SA 738-39. To clarify this criterion, SourceAmerica explained what it was looking for in terms of nonprofit agency management in greater detail in SSN 2333.[6] Despite this additional guidance on how to effectively address this criterion, a criterion included in both SSN 2000 and SSN 2333, NTI again failed to provide a satisfactory response in its second proposal. SA Mem. at 19; see, e.g., AR 1738 (comments of evaluator Michael McDermott) ("[***]").

b. SourceAmerica Established a New Evaluation Team

The record demonstrates that SourceAmerica complied with the second Commission guideline to "establish an evaluation team of SourceAmerica staff members who were not involved in the first posting." AR 94; see SA Mem. at n.15 (demonstrating

---

[5] SourceAmerica further clarified the subcontracting criterion in SSN 2333's initial "key notice" information. AR 1500 (explaining "[i]f other aspects of the proposals received are equal, SourceAmerica will give preference to the CRP with the highest degree of organic technical capability, resulting in the least amount of subcontracting risk, subcontract labor, and/or subcontract dollars.").

[6] Compare SSN 2000 Response Requirement #2 at SA 4 "(Capacity) Describe your organization's overall ability to commit organizational resources, and have available the technical and management bandwidth to support a November 2013 start date for this project, including pricing activities, production of customer deliverables, etc.") with SSN 2333 Response Requirement #4 at AR 1526 ("Describe your CRP's executive and senior management infrastructure that supports and integrates successful execution of this opportunity. Include, at minimum, a description of the following specifics: 1) Management hierarchy/structure; 2) Management communication infrastructure; 3) Management principles and tools to be utilized for June start-up and throughout contract performance.").

no overlap between the first and second evaluation team members). Here, "posting" refers "to the solicitation and its evaluation." SA Reply at 17. Despite the evidence of SourceAmerica's compliance, NTI argues that SourceAmerica failed to adhere to the second requirement because: (1) two SourceAmerica employees participated in both evaluations; and (2) Ryan Blackman, the deciding official assigned to SSN 2333, "was involved in the earliest stages of the development of SSN 2000, through the evaluation phase, and into the post-award stage." Pl. Mem. at 17.

NTI contends that SSN 2333 evaluators Ted Prindle and Chris Seventko were involved in the first posting based on two emails. Yet, any involvement by Mr. Seventko or Mr. Prindle in SSN 2000, however limited, came well after SourceAmerica completed the evaluation process and awarded the contract to Peckham. As to Mr. Prindle, NTI cites a single email referring to him as a potentially interested party to a conference call discussing the USDA award. Pl. Mem. at 19; SA 2715. NTI fails to acknowledge, however, that this email and the conference call to which it refers took place post-award, and therefore would not have involved information about the actual evaluation. See Tr. at 82-83 (explaining conference call took place after SSN 2000 evaluations were closed). Similarly, NTI argues that Mr. Seventko was involved in the first posting based on a post-award email. See Pl. Mem. at 17. Much like its argument respecting Mr. Prindle, however, NTI's argument also fails with regard to Mr. Seventko because any contact he had in relation to SSN 2000 occurred post-award, and consequently post-evaluation.

Finally, NTI argues that Mr. Blackman's role as the executive director for SSN 2333 tainted the evaluation process. However, as NTI itself concedes, Mr. Blackman had "legitimate business reasons" for his early involvement with the USDA HelpDesk Services opportunity. See Pl.'s Reply at 15-16. In his role as senior deputy director, Mr. Blackman helped to transition the USDA opportunity to an AbilityOne program. Gov't Mem. at 33. He also helped the technical expert consultants navigate SourceAmerica's internal structure and processes. Specifically, Mr. Blackham coordinated with the consultants to ensure that they understood SourceAmerica's staffing structure and general evaluation procedures. See, e.g., SA 3386. He did not, however, take part in evaluating SSN 2000 proposals, nor did he have access to the evaluations materials and substantive proposals maintained within the secure Front Office Application ("FOA") system. Consequently, the fact that Mr. Blackman served as executive director for the second posting did not "taint" the SSN 2333 evaluation process because he was never involved in evaluating SSN 2000 proposals, and in fact, Mr. Blackman never had access to those proposals or any of the materials used to evaluate them.

c.  SourceAmerica Designated a New Evaluation Official

Ms. Ballard's third guideline required that "[t]he SourceAmerica Executive Director making the recommendation should not have been involved with the first posting." AR 94. Again, in this context, "posting" refers "to the solicitation and its evaluation." SA

Reply at 17.  Accordingly, Ms. Ballard's "phrase 'not involved with the first posting' refers to the first proposals and their evaluation, not to conduct of business that preceded or followed that evaluation." Id.  To comply with Ms. Ballard's directive, SourceAmerica selected Mr. Blackman to serve as executive director for the SSN 2333 posting.  Mr. Blackman was experienced in the Procurement List addition process and well-regarded within SourceAmerica and by the AbilityOne Commission.

As executive director of the SSN 2333 posting, Mr. Blackman "was responsible for reviewing the evaluators' findings, recommending an NPA to the Commission, and notifying the NPAs of his recommendation." Gov't Mem. at 32; see also AR 2639-45.  His tenure as executive director was the only point at which Mr. Blackman had access to the substantive information in the parties' proposals and SourceAmerica's evaluative information.  Contrary to NTI's contentions, there is simply no support for the argument that Mr. Blackman was involved in SSN 2000's evaluative process or was exposed to information that would have biased his actions as executive director of SSN 2333.  The record and briefing instead suggests that Mr. Blackman wears many hats at SourceAmerica, only one of which involved exposure to evaluative findings related to the USDA HelpDesk Services opportunity.

### d.  SourceAmerica's Second Evaluation Was Not Contaminated

NTI correctly asserts that SourceAmerica did not create "[a] 'firewall' between the first posting and the second posting . . . so no one on the new team ha[d] access to any details of responses to [the] first posting or any evaluation details," according to Ms. Ballard's final guideline.  Pl. Reply at 17; AR 94 (listing final guideline).  What NTI's argument fails to acknowledge, however, is that SourceAmerica did not have to set up or create a new IT infrastructure to meet this requirement.  See SA Reply 17-18.  Its existing FOA document control system effectively satisfied Ms. Ballard's fourth guideline.[7]

To the extent that any messages relating to the first posting reached SSN 2333 evaluators, NTI fails to show how any such message caused an irrational second evaluation process.  SA Mem. at 36-37.  Finally, NTI's additional arguments concerning similarities between SSN 2000 and SSN 2333 evaluators' descriptions of the opportunity or project history are unpersuasive.  The language appeared verbatim in both publicly distributed notices.  SA Reply at 18.

---

[7] See SA Mem. at 7 ("One tool used to protect source selection information is SourceAmerica's Front Office Application ("FOA") system.  FOA serves as the official repository of source selection documents, and access is closely protected.  During an evaluation, only members of an evaluation team have access to NPA proposals; other employees of SourceAmerica do not have access to the system.").

3.  The Award Decision in Favor of Peckham Was Reasonable

As noted above, the AbilityOne Committee's regulations set out four criteria that a commodity or service must satisfy to be considered "suitable" for addition to the Procurement List.  Much of the suitability assessment involves the qualifications of the nonprofit agency providing the services.  As the regulations state, "[f]irst, the service must have the potential to generate employment for the severely disabled.  41 C.F.R. § 51-2.4(a).  Second, the selected NPA must 'qualify' for the program.  *Id.*  Third, the selected NPA must be capable of providing the service.  *Id.*  Fourth, the addition of the service to the Procurement List should not have severe adverse impact on the incumbent.  *Id.*"  Gov't Reply at 1-2.  When assessed against these four suitability criteria, the Committee's decision to add the USDA HelpDesk Services to the Procurement List with Peckham as the service provider was rational and in accordance with applicable law.

The USDA's HelpDesk opportunity, as provided by Peckham, had the potential to generate employment for the severely disabled.  See, e.g., AR 302 ("The Commission noted that call centers are routinely staffed by severely disabled individuals and [] the Federal Government regularly utilizes such individuals on these contracts.").  Through its hiring, training, and staffing framework, Peckham demonstrated a commitment to employing severely disabled individuals and veterans.  Id. 2423, 2424, 2449, 2479, 2503.

Peckham qualifies to participate in the AbilityOne Program as an agency that is "operated in the interest of severely disabled individuals who are not blind," 41 U.S.C. § 8501(6), and "employs . . . severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products or services." 41 C.F.R. § 51-2.4(a)(3).[8]  To participate in the Program, nonprofit agencies must certify compliance with the direct labor ratio by completing annual certifications and submitting to onsite visits and audits.  41 C.F.R. §§ 51-2.4(a)(3), 51-4.3.  Indeed, the Commission explained that "Peckham has been in the AbilityOne Program for 25 years, and in that time its agency-wide direct labor ratio has never dropped lower than 75% and is usually above 80%."  AR 233 (emphasis in original).

Despite Peckham's clear qualifications, NTI contends that SourceAmerica ignored the statutory purpose of the AbilityOne Program when it "failed to follow its B-1 policies and procedures."  Pl. Mem. at 22.  According to NTI, SourceAmerica's B-1 policies and procedures require it to consider which nonprofit agency will "maximize employment" for the target population.  NTI claims that had SourceAmerica followed this "authentic mandate," it would have determined that NTI was more qualified for this opportunity than

---

[8] According to the statute, "[t]he term "severely disabled individual" means an individual or class of individuals under a physical or mental disability, other than blindness, which (according to criteria established by the Committee after consultation with appropriate entities of the Federal Government and taking into account the views of non-Federal Government entities representing the disabled) constitutes a substantial handicap to employment and is of a nature that prevents the individual from currently engaging in normal competitive employment."  41 U.S.C. §8501(8).

Peckham because NTI employees are homebound and therefore are the "most severely disabled." Pl. Reply at 23. The Court does not find support for this argument in the JWOD Act.

In passing the JWOD Act, Congress directed "the CNAs [to] assist the Commission with the identification, evaluation, and distribution" of "employment and training opportunities for persons who are blind or have other severe disabilities." 41 U.S.C. § 8503(c); 41 C.F.R. §§ 51-3.2, 51-1.1. Pursuant to the Commission's directives and its "overarching goal to increase" such training and employment opportunities, SourceAmerica published AbilityOne Program Bulletin No. B-1. 41 C.F.R. § 51-1.1; AR 330-38. As Bulletin B-1 states, SourceAmerica

> will adhere to a set of best practices consistent with its mission, vision, values, and goals, and to [its] role as defined by regulation, to maximize the employment options for people with significant disabilities, by aggressively preserving existing and proactively developing new job opportunities for people with significant disabilities. A clear and transparent Project Development Distribution process is essential to the achievement of this goal.

AR 330. NTI's argument essentially rewrites this policy statement to create a maximization mandate, rather than an overarching policy goal, which it then claims SourceAmerica disregarded during the evaluation process.

The Court is not persuaded by NTI's "maximization of employment" argument. NTI asks this Court to decide whether employing individuals with visible, physical disabilities should render a nonprofit agency more qualified under the regulations than an agency employing individuals with less visible physical or mental disabilities. The Court will not engage in such analysis. Nor does it find any evidence in the record or statutory framework to suggest that the AbilityOne Program was meant to weigh the severity of a person's disability after that individual qualifies under the statutory definition of "severely disabled individual." SourceAmerica, the Committee's staff, and the Committee itself determined that Peckham qualified for this opportunity. The evaluators were persuaded that Peckham satisfied the 75 percent direct-labor ratio and approved its "plans for employing severely disabled persons with a range of physical and mental disabilities." SA Reply at 12.

The regulations also require that the selected nonprofit agency be capable of performing the contract. As outlined above, potential nonprofit agency providers are assessed via AbilityOne's three-tiered evaluation process. Once the Committee decides that a good or service is capable of being provided by the severely disabled and therefore suitable for procurement through the Program, SourceAmerica, as the designated central

nonprofit agency, publishes a Sources Sought Notice. This notice accomplishes what a request for proposals ("RFP") normally would in ordinary government procurement.[9] The proposals are then evaluated independently at three separate levels before a winner is selected.

At every stage of the evaluation process, individuals and organizations experienced with the AbilityOne procurement process assessed both NTI's and Peckham's responses to SSN 2000 and SSN 2333. NTI's strengths did not go unnoticed, but over the course of two years, "the recommendation[s] of every individual who and organization that assessed the competing proposals" favored Peckham in terms of ability to provide the requested service.[10] SA Mem. at 2. As the contracting agency, the USDA also reviewed Peckham's technical capabilities and provided its own assessment to the Commission.[11] Based on its assessment, the USDA concluded "that Peckham has the technical capability and capacity to perform the IT Service Desk Support Service requirement." AR 228. Following these initial evaluations and assessments, the Commission's executive staff reviewed Peckham's proposal, along with SourceAmerica and the USDA's recommendations, and ultimately concluded "that Peckham had adequately demonstrated its technical capabilities." Id. 127-29, 312-15. Finally, after receiving and reviewing summaries of all of the recommendations and proposal materials, the presidentially-appointed Committee members "unanimously determined that the HelpDesk Services should be added to the Procurement List and provided by Peckham." Id. 127-29, 312-15, 352.

The fourth and final regulatory condition requires the Commission to assess the impact that adding the good or service to the Procurement List will have on the current contractor. 41 C.F.R. § 51-2.4(a). The incumbent contractor for the HelpDesk Services is IBM, currently twenty-fourth on the Fortune 500 with reported annual revenues of $104 billion. Gov't Mem. at 28; AR 232. The Commission rationally determined that adding the $60 million HelpDesk Services contract to the Procurement List would "not have [a] severe adverse impact on the incumbent." 41 C.F.R. § 51-2.4(a); AR 232. IBM has not

---

[9] In an AbilityOne procurement, the government-issued RFP "comes relatively late in the process. It is a single source RFP in accordance with FAR § 6.302-5, issued after a single NPA has been recommended to proceed." SA Mem. at 6.

[10] Compare SSN 2333 NTI evaluations: Evaluator A, AR 1735 ("[***]"), and Evaluator B, id. 1735 ("[***]"), and Evaluator C, id. 1736-37 ("[***]"), and Evaluator D, id. ("[***]"), with SSN 2333 Peckham evaluations: Evaluator A, id. 1734 ("[***]"), and Evaluator B, id. ("[***]"), and Evaluator C, id. 1736 ("[***]"), and Evaluator D, id. 1737-38 ("[***]").

[11] See AR 228-29 ("Specifically, the USDA determined that Peckham: [1] Exhibited clear understanding of contract requirements and magnitude; [2] Designated technical expertise and experience in IT Service Desk Support; [3] Proposed technical approach and addressed the full scope of USDA's requirement and how they will specifically satisfy the requirements; [4] Address subcontracting opportunities to perform scope of work; [5] Provided Past Performance history including several requirements similar in size and scope; [and 6] Provided a high confidence level and a plan for recruiting, hiring, and retaining personnel.").

opposed adding the HelpDesk Services opportunity to the Procurement List and nowhere in NTI's motions before this Court does it dispute this finding.

Conclusion

NTI could have filed this protest at least six months before it finally chose to do so. Instead, it opted to weigh the cost of litigation while pursuing its own means of resolution. By virtue of NTI's delay, the Government and Intervenors have incurred costs that could have been avoided. The doctrine of laches precludes relief to one who slumbers on his rights to the disadvantage of the other parties. Accordingly, NTI's claims in this case are barred by the doctrine of laches.

In the context of a procurement protest, the APA's standard permits this Court to set aside an agency's procurement decision only where it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. When evaluating a challenge on the first ground, a court "must determine 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." Axiom Res., 564 F.3d at 1381 (quoting Impresa, 238 F.3d at 1332-33). As the record demonstrates, SourceAmerica and the AbilityOne Commission carefully considered each proposal before selecting Peckham for this opportunity. By way of the nonprofit agencies' responses to SSN 2333, SourceAmerica and the Commission evaluated the proposals according to each of the four regulatory requirements within 41 C.F.R. § 51-2.4(a)(1)-(4). The evaluations, recommendations, and decisions contained in the administrative record are coherent and provide very reasonable explanations for awarding the opportunity to Peckham. Accordingly, the agencies' decision to add the HelpDesk Services, as performed by Peckham, to the Procurement List was reasonable with a rational basis in fact and law.

When bringing a challenge "on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.'" Axiom Res., 564 F.3d at 1381 (quoting Impresa, 238 F.3d at 1332-33). Despite NTI's insistence to the contrary, the second evaluation team adhered to Ms. Ballard's four guidelines throughout the posting process for SSN 2333. The agencies made their decision in accordance with both these procedural directives and the applicable statutory regulations. As such, Plaintiff NTI has failed to meet its burden of demonstrating that this agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Based upon the foregoing, the Court DISMISSES NTI's claims as untimely, and alternatively GRANTS the Government's and Intervenors' Cross-Motions for Judgment on the Administrative Record.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge